IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SANTA FE GOLDWORKS INC. and
DAVID GRIEGO,

      Plaintiffs,

      v.                                                              Civ. No. 24-1005 SCY/KK

TURQUOISE TRAILS, LLC, AHMAD
SHAWABKEH, EDEN ON THE PLAZA,
LLC, MAJED HAMDOUNI, RACHID
SAGHROUNI, FRANCHESKA
SANDOVAL, and MARK SULEIMAN,

      Defendants.

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO DISMISS

Defendant Mark Suleiman moves to dismiss Plaintiffs' claim against him for Vicarious Copyright Infringement (Count III, Doc. 15 ¶ 73). He argues that the allegations in the amended complaint are conclusory and insufficient to state a claim that he is liable for Eden's alleged copyright infringement. The Court disagrees and therefore denies Defendant Suleiman's motion to dismiss.

## BACKGROUND

Plaintiff David Griego owns Plaintiff Santa Fe Goldworks, a jewelry store in Santa Fe. Doc. 15 ¶¶ 1, 5 (amended complaint). Plaintiffs are suing Defendants, who are variously associated with neighboring businesses, claiming copyright infringement in certain of Plaintiffs' jewelry designs. *Id.* ¶¶ 2-3. The moving defendant, Mark Suleiman, is the leaseholder of one of the neighboring businesses, Eden On The Plaza. *Id.* ¶ 14. The amended complaint does not allege that Suleiman is the owner of Eden. Rather, Majed Hamdouni, Rachid Saghrouni, and Francheska Sandoval are co-owners of Eden. *Id.* ¶ 33. Hamdouni has primary control over the day-to-day operations of Eden, including sourcing inventory for the store. *Id.* ¶ 34.

Plaintiffs allege that Suleiman "finances" Eden, *id.* ¶ 14, "supplies the Eden Defendants with merchandise, including infringing merchandise," *id.* ¶ 37, and "controls" Eden, *id.* ¶¶ 14, 37. They allege that "Majed Hamdouni has owned and operated other jewelry stores that have failed, but Mark Suleiman's financing and control support[s] Eden on The Plaza." *Id.* ¶ 36. They also allege that Majed Hamdouni wished to begin retailing cosmetics at Eden, but Suleiman did not permit it, and Majed Hamdouni acquiesced. *Id.* ¶ 36. Lastly, they allege that Suleiman is "consistently and frequently physically present" at Eden. *Id.*

## LEGAL STANDARD

Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In turn, Rule 12(b)(6) allows a court to dismiss a complaint for failure to state a claim upon which the court can grant relief. "[T]o withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (internal quotation marks omitted). Although Rule 8(a)(2) does not require detailed factual allegations, it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The court is not required to accept conclusions of law or the asserted application of law to the alleged facts. *See Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994). Nor is the court required to accept as true legal conclusions that are masquerading as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A court considering a challenge under Rule 12(b)(6) may proceed according to a "two-pronged approach." *Iqbal*, 556 U.S. at 679. First, a court "can choose to begin by identifying

pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

For purposes of this second prong, the Court "accept[s] the well-pled factual allegations in the complaint as true, resolve[s] all reasonable inferences in the plaintiff's favor, and ask[s] whether it is plausible that the plaintiff is entitled to relief." *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013) (internal citations and quotation marks omitted); *see also Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (the court must view a plaintiff's allegations in the light most favorable to him or her). "Plausible" does not mean "likely to be true." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022, 1034 (10th Cir. 2020) (quoting *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). "Rather, 'plausibility' in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Robbins*, 519 F.3d at 1247 (internal quotation marks omitted). In other words, "[a] claim is facially plausible when the allegations give rise to a reasonable inference that the defendant is liable." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).

Even under *Twombly* and *Iqbal*, however, the Rule 8 standard is notice pleading, *Khalik*, 671 F.3d at 1191-92, which is a "low bar," *Quintana*, 973 F.3d at 1034. "Thus, as the Court held

3

in *Erickson v. Pardus,* 551 U.S. 89, 93 (2007), which it decided a few weeks after *Twombly,* under Rule 8, 'specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Khalik*, 671 F.3d at 1192 (alterations omitted). "While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim." *Id.* (quoting with approval the Ninth Circuit's holding that "*Twombly* and *Iqbal* do not require that the complaint include all facts necessary to carry the plaintiff's burden" (citing *al-Kidd v. Ashcroft*, 580 F.3d 949, 977 (9th Cir. 2009), *rev'd on other grounds*, 563 U.S. 731 (2011))).

## DISCUSSION

"There are several flavors of secondary liability for copyright infringement." *Greer v. Moon*, 83 F.4th 1283, 1287 (10th Cir. 2023). The variation pled here—vicarious liability— "attaches when the secondary infringer has an obvious and direct financial interest in the exploitation of copyrighted materials and the right and ability to supervise the direct infringer." *Id.* (emphasis and quotation marks removed). "Vicarious liability has no knowledge requirement." *Id.*

Taking the allegations in the amended complaint as true and drawing all reasonable inferences in Plaintiffs' favor from those allegations, a reasonable jury could conclude that Defendant Suleiman's conduct satisfies both elements of the Tenth Circuit's vicarious liability test.

### I.     Direct and Obvious Financial Interest

With respect to the financial interest factor, the amended complaint alleges that Suleiman "supplies the Eden Defendants with merchandise, including infringing merchandise, to display and sell", "finances" Eden, and is Eden's landlord. Doc. 15 ¶¶ 14, 36-37. A reasonable jury,

4

taking these allegations together and drawing all reasonable inferences in favor of Plaintiffs, could conclude that Suleiman has a financial interest in Eden and the infringing jewelry it allegedly sells.

*Supplying infringing merchandise.* The allegation that Suleiman supplies Eden with infringing merchandise for it to sell is alone sufficient to support a finding that Suleiman has a direct and obvious financial interest in Eden's infringement. Suleiman's primary argument otherwise is that this fact bears on a different legal theory: *direct* copyright infringement as opposed to indirect infringement. Doc. 20 at 6-7. True, the act of supplying infringing merchandise might support a direct infringement claim. But it is also true that, drawing all reasonable inferences in Plaintiffs' favor, a person who supplies infringing merchandise to be sold has a financial interest in the sale of that merchandise. Suleiman provides no rationale or legal support for the notion that an act which supports a direct infringement claim cannot simultaneously establish financial interest for purposes of a vicarious infringement claim. Nor is any reason for such mutual exclusivity readily apparent. Consequently, Suleiman's primary argument is unpersuasive.

Suleiman also points out in his reply brief that Plaintiffs' amended complaint does not specify whether the infringing items Suleiman supplies are "gifted, sold, or transferred through some other arrangement" and does not allege that Suleiman obtains revenue from the jewelry he supplies. Doc. 34 at 4. At the motion to dismiss stage, however, all reasonable inferences must be drawn in Plaintiffs' favor. *Diversey*, 738 F.3d at 1199. At this stage, it is plausible, and reasonable to infer, that a person who supplies a jewelry shop with jewelry to be sold at that shop has a financial interest in the jewelry provided and then sold.

In short, Plaintiffs' allegation that Suleiman supplies the infringing merchandise sold is

enough, by itself at the motion to dismiss stage, to satisfy the financial interest element of a vicarious infringement claim. Plaintiffs' remaining allegations, although perhaps not sufficient on their own to support a finding of financial interest, tend to fortify such a finding.

*Landlord-tenant relationship.* Suleiman argues that vicarious liability does not attach to a landlord by the mere act of renting space to a tenant who engages in copyright infringement. Doc. 20 at 4. Plaintiffs do not argue otherwise. Doc. 33 at 2 (citing *Deutsch v. Arnold*, 98 F.2d 686, 688 (2d Cir. 1938) ("[s]omething more than the mere relation of a landlord and tenant must exist to give rise to a cause of action")). But just because the mere existence of a landlord-tenant relationship is insufficient on its own to support a vicarious liability claim does not mean it is altogether irrelevant.

Courts have held landlords liable for secondary copyright infringement when other factors also point to a financial benefit from infringement. *E.g.*, *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996) (considering as direct financial benefits "the payment of a daily rental fee" by booth renters to the landlord, along with other factors such as admission fees paid to the landlord by booth customers and "incidental payments for parking, food and other services by customers seeking to purchase infringing recordings"). Here, Plaintiffs allege that at least some of Eden's revenue comes from selling infringing jewelry that Suleiman provides to Eden. Thus, it reasonably can be inferred that Suleiman, as a landlord who expects rent to be paid, has a financial interest in the infringing jewelry he supplies and that Eden, to obtain revenue used to pay expenses such as rent, sells. By supplying the infringing jewelry that Eden sells to likely help pay rent, Suleiman, as landlord, has a financial connection to the product his tenant sells. This connection goes beyond that of typical of a "mere landlord." *See Fonovisa*, 76 F.3d at 263.

*Financing.* Regarding Plaintiffs' allegation that Suleiman "finances" Eden, Suleiman argues that the allegation lacks detail and is therefore impermissibly conclusory. Doc. 20 at 6. As Suleiman points out, Plaintiffs do not allege whether the "financing took the form of a gift, a loan, or an investment . . . ." Doc. 20 at 6. Plaintiffs' allegations of financing, however, must be read in context with Plaintiffs' other allegations. As noted, Plaintiffs allege that Suleiman supplies the infringing product Eden sells. This distinguishes Suleiman from a bank or other traditional source of financing that has no involvement in the day-to-day operations of the business being financed. Indeed, Plaintiffs also allege that Suleiman is "consistently and frequently physically present" at Eden. Doc. 15 ¶ 36. The most likely inference to be drawn from these facts is not that Suleiman is a magnanimous gifter. Rather, the more likely inference is that Suleiman is a financier who is involved in the day-to-day operations of Eden and has a financial interest in Eden obtaining revenue so that he can obtain a return on his investment or loan, be paid for the infringing products he supplies, and be paid the rent he charges.

Plaintiffs' combined allegations of leasing the premises to Eden, financing Eden's operations, and supplying merchandise (including infringing merchandise) for it to sell, state a plausible claim that Suleiman had an obvious and direct financial interest in Eden's infringement.

## II.     Ability to Supervise

The second part of the vicarious infringement test asks whether the alleged secondary infringer has the right and ability to supervise the direct infringer. *Greer*, 83 F.4th at 1287. As Suleiman points out, Plaintiffs claim that Majed Hamdouni, Rachid Saghrouni, and Francheska Sandoval, not Suleiman, are co-owners of Eden. Doc. 15 at ¶ 33. Further, Hamdouni, not Suleiman, has primary control over the day-to-day operations of Eden, including sourcing inventory for the store. *Id.* ¶ 34. This demonstrates, Suleiman argues, that he does not supervise

Eden. Doc. 20 at 8.

Plaintiffs also allege, however, that Hamdouni wanted to begin retailing cosmetics at Eden, but Suleiman did not permit it, and Hamdouni acquiesced. Doc. 15 ¶ 36. Suleiman's ability to control what Eden sells or does not sell at the store indicates that Suleiman has the ability to supervise what happens at the store. Faced with the allegation that Suleiman prevented the sale of narcotics at the store, Suleiman asserts a possibility exists that Eden's lease might forbid the sale of cosmetics and that Suleiman was simply enforcing the terms of a lease rather than making operational decisions for Eden. Doc. 20 at 9. Indeed, Suleiman argues, the amended complaint suggests Suleiman was exercising his limited rights as a leaseholder—not operational control—because "Suleiman allegedly prevented Hamdouni from 'retailing cosmetics at 60 E. San Francisco St.,' not any other address." Doc. 20 at 9 (citing Doc. 15 ¶36).

The Court disagrees that the amended complaint makes such a suggestion. Other than Plaintiffs' own place of business, the only business address Plaintiffs refer to in the amended complaint is 60 E. San Francisco Street. And, there is no indication in the amended complaint that Hamdouni sought to sell cosmetics at some other address. Accordingly, the amended complaint provides no indication that the prohibition against the sale of cosmetics at 60 E. San Francisco Street stands in contrast to the sale of cosmetics at some other location. Looking to the allegations in the amended complaint, the notion that the lease for this shop would allow it to sell jewelry, but not cosmetics, is pure speculation. Unlike the situations in *Twombly*, 550 U.S. at 554-57, and *Iqbal*, 556 U.S. at 681-83, where implausible inferences gave way to more likely explanations, hypothetical restrictions in a lease do not constitute a more likely explanation for Suleiman's prohibition of cosmetic sales. Accepting the factual allegations in the amended complaint as true, Suleiman was Hamdouni's landlord, supplied the infringing products

8

Hamdouni sold, and financed Hamdouni's operation. It is plausible that Suleiman's interest in making money from the infringing products he supplied, rather than a hypothetical lease provision, motivated him to restrict Eden from selling cosmetics. And, as Eden's landlord, supplier, and financier, it is plausible that Suleiman possessed sufficient supervisory power to restrict Eden from selling cosmetics. *See Khalik*, 671 F.3d at 1190 ("[T]o withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face.") (internal quotation marks omitted).

Further, a line of cases from the Ninth Circuit demonstrates the significance of Plaintiffs' allegation that Suleiman supplied infringing jewelry to Eden. These cases indicate that the second vicarious infringement element—right and ability to supervise the direct infringer—is met where an alleged secondary infringer has the right and ability to *control* the infringing activity. *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 803-04 (9th Cir. 2007). Take, for instance, Napster—a company that provided users with a forum on the internet that made it easy for users to share and download copyrighted music files. *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1011-12 (9th Cir. 2001), *as amended* (Apr. 3, 2001), *aff'd sub nom. A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002), and *aff'd sub nom. A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002). In considering the issue of vicarious liability for copyright infringement, the Ninth Circuit held that "[t]he district court correctly determined that Napster had the right and ability to police its system and failed to exercise that right to prevent the exchange of copyrighted material." *Id.* at 1023. That is, Napster was potentially vicariously liable for its users' copyright violations because it had the right and ability to control the illegal trading and downloading of copyrighted music. *See Perfect 10 v. Visa*, 494 F.3d at 803-04 (discussing its previous decision in *Napster*).

Similarly, the Ninth Circuit indicated that a flea market proprietor who provided facilities where pirated works were sold could be held vicariously liable for copyright infringement at the flea market because the swap meet operator had notice of the infringing activity; made money from parking, food, and other services paid by customers seeking to purchase infringing products; and "had the right to remove infringers from the very place the infringement was happening." *Perfect 10 v. Visa*, 494 F.3d at 805 (citing *Fonovisa,* 76 F.3d at 263-64). The Ninth Circuit's rationale in these cases is consistent with the rationale the Second Circuit employed more than sixty years ago to find that a dance hall owner can be vicariously liable "for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income." *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963) (collecting cases).

Such cases stand in contrast to those in which the alleged secondary infringer was farther removed from the infringing activity. For instance, in *Perfect 10 v. Visa*, the Ninth Circuit considered whether Visa and MasterCard, after having been put on notice that certain websites were illegally selling copyrighted material, could be held vicariously liable for processing the credit card payments made to purchase the allegedly infringing material. 494 F.4d at 793, 804. The court acknowledged that "Defendants could likely take certain steps that may have the indirect effect of reducing infringing activity on the Internet at large." *Id*. at 803. However, it continued, the defendants did not have "any ability to directly control that activity, and the mere ability to withdraw a financial 'carrot' does not create the 'stick' of 'right and ability to control' that vicarious infringement requires." *Id*. Thus, the Ninth Circuit concluded, Visa and Mastercard could not be held vicariously liable merely for processing credit card payments to websites

which the plaintiff alleged infringed its copyright. *Id.* For the same reasons, the Ninth Circuit also found "Google was not vicariously liable for third-party infringement that its search engine facilitates." *Id.* at 804 (citing *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 730-32 (9th Cir.), amended and superseded on reh'g, 508 F.3d 1146 (9th Cir. 2007)).

Comparing the above cases where courts have recognized a path to vicarious liability with those cases where the court has foreclosed such a path highlights the difficulty of determining exactly when the provider of a business or service should be exposed to vicarious copyright infringement liability for failing to take steps to stop or reduce infringing activity about which the provider has notice. The present case, however, does not require the Court to determine exactly where a red line should be drawn in a field of gray. Here, Plaintiffs' allegations place Suleiman outside the area of gray that exists between the alleged vicarious infringement in *Napster* and that in the *Perfect 10* cases. Taking Plaintiffs' allegations as true, Suleiman is more than an uninvolved provider of services. Suleiman allegedly provides the very infringing jewelry at issue. As Suleiman points out, this might make him a direct infringer. Doc. 20 at 6. As a separate consideration relevant to a vicarious liability analysis, however, Suleiman's control over the infringing jewelry sold also provides Suleiman the right and ability to control the infringing activity. To end Eden's sell of the infringing jewelry Suleiman provides, Suleiman merely needs to cease supplying Eden with such infringing jewelry. In this way, Suleiman, unlike the credit card companies in *Perfect 10 v. Visa*, has an absolute right to stop the infringing activity. 494 F.3d at 805-806 (finding credit card companies "have no absolute right to stop that activity—they cannot stop websites from reproducing, altering, or distributing infringing image").

Finally, Plaintiffs also allege that Suleiman is "consistently and frequently physically

11

present" at Eden, is Eden's landlord, and is Eden's financier. Doc. 15 ¶¶ 14, 35-36. Although these allegations do less to demonstrate ability to supervise then Plaintiffs' allegations that Suleiman supplied the infringing product and prevented certain other merchandise from being sold, they are nonetheless relevant. True, the constant and frequent presence of a shop owner in a neighboring shop does not by itself indicate an ability to supervise the neighboring shop. When the visiting shop owner is also the supplier of infringing material the neighboring shop sells, holds the lease to the neighboring shop, finances the neighboring shop, and limits what other merchandise the neighboring shop can sell, a consistent and physical presence adds to the plausibility that the visiting shop owner possesses the ability to supervise the neighboring shop. Similarly, the power that comes with being a landlord and financier adds to the plausibility that Suleiman had the ability to supervise the infringing activity at Eden. Taken together, Plaintiffs' allegations state a plausible claim that Suleiman had the ability to supervise Eden's activities.

## **CONCLUSION**

For the above stated reasons, Defendant Suleiman's Rule 12(b)(6) Motion To Dismiss is DENIED.

_____
STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE